## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Matthew J. Deurmeier, am a Special Agent (SA) of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been employed by the FBI as a Special Agent for over nine years and am currently assigned to the FBI Bozeman Resident Agency in Bozeman, Montana. I have training and experience in conducting federal criminal investigations and have worked criminal matters involving terrorism, violent criminal offenses, firearm offenses, and civil rights matters. In addition, I am assigned to conduct national security investigations as a member of the Joint Terrorism Task Force ("JTTF"). I have participated in numerous national security investigations and have received extensive training and experience in the conduct of national security investigations including both domestic and international terrorism.

2. This affidavit is submitted in support of a Criminal Complaint charging Fabjan Alameti ("ALAMETI"), who recently moved from the Bronx, New York, to Bozeman, Montana, with unlawfully possessing a firearm, in violation of 18 U.S.C. § 922(g)(3), and making false statements relating to international and domestic terrorism, in violation of 18 U.S.C. § 1001.

1

3. The facts set forth in this Affidavit are based upon my personal involvement in this investigation, training and experience, my review of relevant evidence, and information supplied to me by other law enforcement officers. This Affidavit is intended to show that there is probable cause to arrest and detain Alameti for the crimes specified herein and does not purport to set forth all of my knowledge of, or investigation into, this matter.

## SUMMARY OF INVESTIGATION AND PROBABLE CAUSE

4. On October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (*i.e.*, "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. In an audio recording publicly released on June 29,

2

2014, ISIS announced a formal change of its name to the Islamic State. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

5.   On or about May 15, 2018, as part of a terrorism investigation, law enforcement officers in New York City interviewed FABJAN ALAMETI at his residence in the Bronx, New York. During the interview, Alameti stated that he owned and utilized a Facebook account in the name of "Fabjan Alamati". He also admitted that he uses marijuana.

6.   On or about January 17, 2019, an FBI Confidential Human Source ("CHS-1") began reporting on an individual later identified as ALAMETI, who had been posting pro-ISIS comments on pro-ISIS Facebook pages. CHS-1 reported that he/she had engaged ALAMETI in a private conversation via an encrypted electronic messaging application. CHS-1 represented to ALAMETI via the encrypted application that he/she was residing in Jordan and that he/she was a supporter of ISIS. According to CHS-1, ALAMETI stated over the same encrypted text messaging application, that he was planning to travel to Syria to fight with ISIS. ALAMETI also stated, via the same messaging application, that he had been considering conducting an attack on a U.S. government building, gay club, Jewish temple, or U.S. Army recruiting center, but believed that it would be difficult to carry out such an attack because guns are hard to

3

obtain in New York. ALAMETI later stated that he would not conduct an attack in the United States because the United States had allowed him to live in the country and granted him citizenship and instead stated he developed a new plan to join ISIS abroad.

7.      In March 2019, the FBI Field Office in New York executed a federal search warrant issued by Magistrate Judge in the Southern District of New York, on ALAMETI's Facebook account with user name "Leave Me Alone", and unique identifier/Facebook User ID 100023643344501. A review of the search warrant returns yielded conversations via a direct messaging function between ALAMETI and another Facebook user ("Individual-1") between January 26, 2019 and February 27, 2019. The messages between ALAMETI and Individual-1 were in Albanian but were translated by an FBI Albanian linguist.

8.      Based on my review of the translations, ALAMETI told Individual-1 that he intended to travel to Iraq and fight. ALAMETI told Individual-1 that he was in contact with an individual in Jordan that lived in Iraq who was going to facilitate his travel. ALAMETI gave Individual-1 the name of his facilitator. The name provided was the same name being used by CHS-1 to communicate with ALAMETI.

9.      Further review of the information provided in the search warrant return from Facebook showed that ALAMETI told an individual on Facebook between the dates of December 27, 2017 and January 1, 2018, "Inahallah [sic] i come to arish to join ISIS".

4

10. By February 2019, ALAMETI began telling CHS-1 about his desire and ability to travel overseas to join ISIS, but also to engage in attacks in the United States as well. CHS-1's communications with ALAMETI included the following, in substance and in part:

   a. On February 11, 2019, ALAMETI messaged CHS-1, "I wanna go kill some fags". When CHS-1 replied that they needed three months to plan, ALAMETI replied, "We need arms ammo and explosives", "And also the uhaul", and "Gasoline mixed in with explosives will make a good blast also it will burn longer".

   b. On February 22, 2019, ALAMETI shared a screenshot with CHS-1 of a chart showing what appear to be blast radiuses by vehicle type. ALAMETI commented, "Small boxer van is uhaul. That a blast up to 2750 feet".

   c. Between February 27, 2019 and February 28, 2019, ALAMETI messaged CHS-1, "When will the time come for us to hunt them down. I will stand over them while I pierce their bodies with hollow tips. Inshallah we take as many kuffars[1] with us. For the brothers who died and the kids and women."

---

[1] Based on my training and experience in counterterrorism investigations, I am aware that "kuffar[s]" is a term meaning "dis-believer" and is often used by ISIS to refer to non-Muslims.

5

d. ALAMETI messaged CHS-1, "We need extensive research on our ideal target". When CHS-1 asked ALAMETI what targets, ALAMETI replied, "Like I said any military facilities or simply a recruiting center. But there is options for choices". CHS-1 asked ALAMETI if he thought bombs were a must to which ALAMETI replied, "When looking for explosives we are subject to inspection. We must make it our self". ALAMETI also messaged "But if we can't try then the guns are the ideal weapons". ALAMETI messaged CHS-1, "I am doing it for the Hadith[2] of eye for eye and blood for blood since America has killed our Muslim civilians".

e. When CHS-1 messaged ALAMETI if ALAMETI did drugs or drank alcohol, ALAMETI replied, "The only thing I use is marijuana and I only told u know [sic] because u asked".

f. On approximately February 28, 2019, ALAMETI messaged CHS-1 that he was looking to leave New York because of "family issues, warrant and I hate life here in ny bro".

---

[2] Based on my training and experience in counterterrorism investigations, I am aware that a Hadith is a collection of traditions containing sayings of the prophet Muhammad which, with accounts of his daily practice, constitute the major source of guidance for Muslims apart from the Qur'an.

6

g. On March 13, 2019, ALAMETI messaged CHS-1 that he had purchased a bus ticket and sent a screenshot of confirmation of the transaction. According to the screenshot, the trip departed on March 14, 2019, from New York, New York, with a destination of Bozeman, Montana. The ticket cost $243.50 with the passenger name identified as "Fabjan Alameti".

h. On March 14, 2019, ALAMETI messaged CHS-1 and indicated that he was on a bus en route to Montana. ALAMETI indicated he had a job interview in Montana and would be working part-time. ALAMETI messaged CHS-1, "I wish I would have fought with u there. I wanted to be marterd [sic] with you".

i. On March 15, 2019, as ALAMETI claimed to be en route to Montana, he asked CHS-1 to resend him a video link, an apparent reference to a conversation earlier in the morning when CHS-1 sent a video link to ALAMETI about breaking news of an attack on a mosque in New Zealand that killed fifty Muslims. Your affiant is aware of news reports that the alleged shooter wore a camera and live-streamed the incident on multiple social media platforms. CHS-1 replied, "Akhi[3] the video is heart wrenching

---

[3] Based on my training and experience in counterterrorism investigations, I am aware that the term "akhi" is an Arabic term meaning "my brother".

7

walla u don't even wanna see it" to which ALAMETI replied, "I have to akhi", "I [sic] will fuel me", and, "To plot please send it akhi".

j. CHS-1 messaged ALAMETI, "Fuel you for what akhi are sure you wanna act like the kuffar and attack a church or something", and "ok I'll send it". ALAMETI replied, "No not a church", and "But I will attack random people to avenge the blood".

k. A review of the screenshots of the messaging conversation indicate that CHS-1 then sent a Facebook link to ALAMETI.

l. ALAMETI messaged CHS-1, "I'm going to Montana and gonna buy a gun since all they need is a background check and id".

m. CHS-1 messaged ALAMETI, "But akhi are you sure its halal[4] to shoot random people and act like the kuffar did to us". ALAMETI messaged CHS-1, "Of course akhi", "We must ave he [sic] the death and even a single drop of blood should be avenged akhi", "Muslim blood is precious", "I'm gonna buy a gun in Montana", and "And let you know".

---

[4] Based on my training and experience in counterterrorism investigations, I am aware that "halal" is an Arabic term meaning "permissible".

8

   n. CHS-1 messaged ALAMETI, "Akhi I thought you wanted to get a job and have a regular life". ALAMETI replied, "Of course yea" and "But I'm still gonna buy it".

11. On March 14, 2019, FBI agents in New York observed ALAMETI load a bus and depart New York Port Authority Bus Terminal. FBI agents in New York then coordinated with FBI field offices along the bus route and Agents reported observations of ALAMETI at various bus stops throughout the trip.

12. From Minneapolis, Minnesota to Montana, law enforcement officers were positioned in the bus to maintain visual contact with ALAMETI through his arrival in Bozeman.

13. On the evening of March 16, 2019, during a several hour layover in Billings, Montana, FBI surveillance observed ALAMETI leave the bus station, travel to a Wal-Mart, and purchase a Crossman SNR357 air pistol, BBs, CO2 canisters and .177 caliber pellets. I am aware that this particular air pistol is designed to closely resemble a .357 revolver in both appearance and feel.

14. FBI surveillance observed ALAMETI arriving in Bozeman, Montana at approximately 4:00 a.m. on March 17, 2019. ALAMETI purchased a room at the Bozeman Inn, a hotel in close proximity to the bus stop. ALAMETI paid in cash for six days.

9

15.     At approximately 8:30 a.m. on March 17, 2019, FBI surveillance observed ALAMETI walk to the Wal-Mart in Bozeman and go to the sporting goods section. He then asked an employee about purchasing a holster for a handgun which could be worn on the chest. ALAMETI did not find the item he wanted but asked where he could acquire such a holster.

16.     On the evening of March 17, 2019, FBI surveillance observed ALAMETI walk to the Wal-Mart in Bozeman and purchase a black Crossman Legacy 1000 .177 caliber air rifle. FBI surveillance overheard ALAMETI ask a male about rules for purchasing a firearm and ask about Montana concealed carry laws.

17.     On March 18, 2019, FBI surveillance observed ALAMETI enter a sporting goods store in Bozeman. An interview with a store employee yielded review of surveillance footage during the time ALAMETI was in the store. Agents that reviewed the footage identified ALAMETI being in the store for approximately thirty minutes. While in the store, ALAMETI looked at pellet guns, airsoft guns, AR-style rifles, machetes, knives, ammunition, reloading powders, black powder, and camping axes. ALAMETI did not appear to handle any firearms.

18.     On March 20, 2019, ALAMETI was evicted from the Bozeman Inn. According to interviews of hotel staff, housekeeping staff determined that ALAMETI had smoked what appeared to be marijuana in his hotel room. The hotel manager confronted

ALAMETI about the smoke smell and ALAMETI admitted to smoking in his room and paid a smoking fee. After ALAMETI departed the property, the hotel manager did a walk-through of the room where she found the air pellet rifle between the bed and wall. FBI agents secured the item.

19. On the evening of March 20, 2019, ALAMETI checked into a hostel in Bozeman and paid for one week, during which time he remained under continued FBI surveillance.

20. On March 21, 2019, FBI surveillance observed ALAMETI enter a pawn shop in Bozeman. An interview with the store employee yielded that while he was in the shop, ALAMETI asked to handle an M1A long rifle that was displayed on the counter. The employee recalled ALAMETI stating, "You don't see many of these in New York". ALAMETI also inquired about how to purchase a firearm like the M1A rifle. The employee informed ALAMETI that he needed a Montana driver's license.

21. On March 25, 2019, Bozeman Fire Department and an emergency medical technician ("EMT") responded to the hostel. ALAMETI was transported to a local hospital for treatment of what is believed to be acute alcohol intoxication. The hostel manager secured what was believed to be a handgun and ALAMETI's belongings.

22. On the morning of March 25, 2019, Bozeman Police Department met with the hostel manager. The manager stated that ALAMETI was no longer allowed to stay at

the hostel. The police department identified the handgun as a pellet revolver and secured the item and his belongings. The officer advised the manager that if ALAMETI returned to the hostel, to send him to the Law and Justice Center to retrieve his belongings.

23. Upon release from the hospital, ALAMETI walked to the Law and Justice Center and agreed to speak to the officer. As part of an ongoing FBI terrorism investigation, I was present for the interview with ALAMETI. During the interview, I identified myself as an FBI special agent and advised ALAMETI several times that it was unlawful for him to provide false information to me. During the interview, ALAMETI stated, in relevant part: (1) that he has never been linked to anyone who has asked him to travel overseas; (2) that he has never expressed a desire to harm any Americans; (3) that he has never expressed a desire to fight U.S. military overseas; and (4) that he has never expressed a desire to fight for ISIS.

24. Also during the interview, ALAMETI provided written and verbal consent to allow the Bozeman Police Department to download the contents of his cellphone for the purpose of determining whether his phone contained evidence that it was used to view ISIS videos. A review of the download showed the following:

    a. Searches identified in the cellphone that appear to have occurred on February 6, 2019, yielded the phrases "federal buildings in nyc", "tactical knives;

12

b. searches using the Safari search function for the phrases "isis ideology", "isis live map", "getting shot live leak", "murder of cop liveleak", and "police officer killed liveleak";

c. Searches identified in the cellphone using the Google search function yielded the phrases "nyc gun laws", "internet archive anwar al awlaki", "american who joined al qaeda", "4 us soldiers killed in manbij", and "manbij bombing";

d. Searches identified in the cellphone that appear to have occurred on January 21, 2019 yielded the phrases "liveleak stabbed to death", "muslims kill liveleak", and "us soldiers and pkk killed".

e. Searches identified in the cellphone that appear to have occurred on January 29 and 30, 2019, yielded the phrases "isis sinai wiki", "what countries can I visit with Albanian passport", "nyc to Albania to Jordon [sic]", "islamic state", and "isis attacks liveleak;

f. Searches identified in the cellphone that appear to have occurred on February 6, 2019, yielded the phrases "federal buildings in nyc", "tactical knives for sale", "taxi driver gets stabbed liveleak", "taxi driver gets shot liveleak", "police ambushed liveleak"; and

13

    g. Searches identified in the cellphone that appear to have occurred on February 8, 2019, yielded the phrases "isis live map", "Holland tunnel", "car bomb", and "isis jihadology".

25. In addition to continued surveillance, the FBI utilized a second Confidential Human Source ("CHS-2") to meet with ALAMETI in Bozeman. CHS-2's reporting of contact with ALAMETI was corroborated with audio recordings and surveillance.

26. On March 26, 2019, CHS-2 observed ALAMETI smoke marijuana at a park in Bozeman. On March 28, 2019, during a recorded conversation, ALAMETI informed CHS-2 that he was applying for a job in Bozeman. He listed CHS-2 and another individual who ALAMETI identified as ALAMETI's marijuana dealer in Bozeman as references.

27. On March 31, 2019, ALAMETI met with CHS-2. During the meeting, ALAMETI stated that the woman whose house he is living at almost caught him smoking marijuana in the park. CHS-2 observed ALAMETI smoking marijuana during the meeting.

28. On April 1, 2019, ALAMETI sent a text message to CHS-2 asking CHS-2 if he knew of any firing ranges in the area. ALAMETI identified a local firing range that has guns to rent by the hour and expressed an interest to CHS-2 in shooting at the range. Later that day, ALAMETI met with CHS-2, and, in a recorded conversation, told CHS-2

that he and his marijuana dealer went to the "dispensary" and he purchased "two grams". CHS-2 asked ALAMETI if he had purchased the amount. ALAMETI replied that he gave the money to his friend and his friend purchased the marijuana. During the meeting, CHS-2 observed ALAMETI smoking marijuana. ALAMETI admitted to rolling marijuana earlier that day in the house that he is currently staying at, and ALAMETI also stated that he has smoked weed for years.

29. On April 2, 2019, CHS-2 met with ALAMETI and another individual identified as ALAMETI's marijuana dealer in Bozeman. A review of CHS-2's reporting, corroborated by audio recordings, yielded the following information from that meeting, in substance and in part:

    a. CHS-2 observed ALAMETI smoke marijuana in CHS-2's vehicle multiple times.

    b. CHS-2 observed ALAMETI purchase three grams of marijuana from the marijuana dealer in the backseat of CHS-2's vehicle.

    c. During a recorded conversation, ALAMETI stated he could die the following day and asked CHS-2 if he believed in Allah. ALAMETI asked

the dealer if he had heard of Abu-Bakr.[5] ALAMETI told the dealer "He's got some nice tracks you gotta listen to. It's all terrorism shit".

d. ALAMETI stated "I want to shoot up the fucking Bozeman Inn, bro". ALAMETI stated that he had three days left of his stay when he was evicted from the property and was upset that he did not receive a refund. ALAMETI admitted to CHS-2 and the dealer that a hotel staff member walked in on him smoking marijuana.

e. During the meeting, ALAMETI told CHS-2 and the dealer that he knew how to make napalm.

f. ALAMETI claimed to have viewed a PDF form of manuals for pipe bombs and explosions while he used the deep web platform Tor Onion, which he recognized did not disclose his IP address.

g. ALAMETI expressed an interest in going to the gun range in the afternoon of April 3, 2019. ALAMETI stated he wanted to shoot a long rifle he recalled as either an "M4A1" or "MA1" and that he previously looked at the rifle while at a pawn shop in Bozeman.

h. ALAMETI knew the fees to rent and shoot a firearm at the range.

---

[5] I am aware that Abu Bakr al-Baghdadi is the leader of ISIS.

    i. ALAMETI stated he did not like shotguns because "It is not something you can go to battle with".

    j. ALAMETI admitted to CHS-2 and the dealer that he watched a video of what ALAMETI called a "terrorist" blowing up a tank using explosives. ALAMETI stated the video did not contain American soldiers.

    k. ALAMETI told CHS-2 and the dealer that he did not support the U.S. government because they supported "lesbians and gays". ALAMETI stated he does not support the war. ALAMETI stated he was "pissed off" about the United States "killing people in other countries for oil".

29. I am aware that marijuana is a schedule I controlled substance and that according to the Drug Enforcement Administration, schedule one substances have a high potential for abuse and the potential to create physical dependence.

30. On April 3, 2019, ALAMETI traveled with CHS-2 to a firing range near Bozeman. In order to pay for his trip to the range, ALAMETI asked to borrow money from CHS-2 and told CHS-2 he would reimburse CHS-2 with money he expected to receive from his paycheck in the next day or two. CHS-2 agreed and gave ALAMETI $60 in cash to use at the firing range.

31. Upon arriving at the range, ALAMETI was required to fill out and sign a copy of the firing range's policies and procedures form. On the form, he provided his

name, date of birth, and address. He also showed his New York State identification card to verify his age, and paid $35 to rent a firearm and time at a firing bay. Thereafter, ALAMETI selected a firearm and took possession of it. The firearm he possessed was a M1A rifle with serial number 388887. Upon taking possession of the firearm, ALAMETI was arrested by the FBI without incident and taken into custody.

## CONCLUSION

32. Based on the information contained in this Affidavit, there is probable cause to believe that Fabjan Alameti unlawfully possessed a firearm in violation of 18 U.S.C. § 922(g)(3) and provided false statements in relation to a matter involving international or domestic terrorism, in violation 18 U.S.C. § 1001.

_____
Matthew J. Deurmeier, Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this ___9th___ day of April 2019

_____
United States Magistrate Judge Jeremiah C. Lynch
District of Montana