**JEFFREY K. STARNES**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**P.O. Box 3447**
**Great Falls, MT  59403**
**119 First Ave. North, Suite 300**
**Great Falls, MT  59403**
**Phone:   (406) 761-7715**
**FAX:      (406) 453-9973**
**E-mail:  Jeff.Starnes@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**FABJAN ALAMETI**<br><br>Defendant. | **CR 19-13-BU-DLC**<br><br><br><br>**SENTENCING MEMORANDUM** |

## I.      Introduction

The Islamic State of Iraq and al-Sham, more commonly referred to as

"ISIS," is a designated foreign terrorist organization.  *See* 8 U.S.C. § 1189 and

Executive Order 13224 § 1(b).  The group's goal is to establish an Islamic

caliphate in Iraq and Syria and eventually spread its influence globally.[1]  Its tactics are well-documented, and include some of the most heinous acts of violence, human rights violations, and religious persecution, in recent human history, including the indiscriminate use of suicide bombings on civilian populations and gruesome beheadings of captured detractors.

By 2018, ISIS had found an ally in Fabjan Alameti, a twenty year-old Albanian-born United States citizen, who had become well-versed in ISIS ideology, a believer in its objectives, and a supporter of its tactics.  From his Bronx, New York apartment, he spent his days smoking marijuana, watching "ISIS videos" online, and posting about ISIS on a Facebook account.  In May 2018, Alameti's internet activity attracted the attention of the Federal Bureau of Investigation, who questioned him about his fascination with ISIS.  Alameti denied any affiliation with or support for ISIS, and claimed that he only visited ISIS websites when he would "get high."  Alameti's assertions that day were false.

In January 2019, Alameti encountered an FBI Confidential Human Source ("CHS") while posting pro-ISIS messages on a pro-ISIS social media page. Alameti came to believe that the CHS was an ISIS supporter who lived in the Middle East.  This was a rouse.

---

[1]Cole Bunzel, The Brookings Institution, *From Paper State to Caliphate: The Ideology of the Islamic State*, March 9, 2015; *accord* The Stanford Center for International Security and Cooperation, *The Islamic State,* "Organizational Overview," https://cisac.fsi.stanford.edu/ mappingmilitants/profiles/islamic-state#highlight_text_12412 (accessed December 4, 2019).

Over the course of the next two months, Alameti told the CHS, on multiple occasions, that he planned to travel to Syria to join ISIS, and he wished to be martyred on the battlefield.  He also disclosed that he was considering conducting an attack in the United States, and that his list of potential targets included a U.S. government building, gay club, Jewish temple, or U.S. Army recruiting center. Alameti discussed various plans for potential attacks, admitted to the CHS that he downloaded and viewed a manual for making bombs, and shared with the CHS a chart depicting blast radii for different vehicles filled with explosives.

On March 14, 2019, Alameti boarded a bus from New York City to Bozeman, Montana.  While en route, Alameti became aware that a gunman had attacked a mosque in Christchurch, New Zealand, and live-streamed the attack on various social media platforms.  After viewing the livestream, Alameti sent a message to the CHS, stating that he "will attack random people to avenge the blood," and that he was, "going to Montana and gonna [sic] buy a gun since all they need is a background check and id [sic]."

By the time he reached Montana, Alameti had already acquired a realistic-looking pellet pistol, and shortly after his arrival, he purchased a pellet rifle.  He also visited sporting-goods stores where he spent time viewing various firearms machetes and axes.  He also expressed interest in going to a shooting range.

On March 25, 2019, the FBI interviewed Alameti at a police station in Bozeman.  Alameti denied that he had ever expressed a desire to travel overseas and fight for ISIS, he denied that he had any desire to hurt people with guns, and he asserted that he had never said that he wanted to hurt any Americans or anyone in the military.  These assertions were false.

Approximately one week later, Alameti went to a shooting range in Bozeman and attempted to rent a semi-automatic rifle.  The FBI arrested him for possessing a firearm as an unlawful user of a controlled substance, and he subsequently confessed that he lied to the FBI on March 25, 2019.

Alameti now stands convicted of lying to federal officers, but it is the subject matter of his lies, and his motive for deception, that necessitates a lengthy term of imprisonment in this case; not only to punish Alameti for his actions, but also to disrupt and deter further misconduct, and to protect society from any true designs that Alameti has to conduct an attack in the United States.  For those reasons, justice requires a term of imprisonment at the upper end of the guideline range, three years of supervised release, and a $100 special assessment for each count of conviction.

## II.    Outstanding Objections to the PSR

### a.  Objection by the United States

The United States originally notified the Probation Officer that it objected to

4

the calculation of Alameti's guideline sentence because it intended to seek an

enhancement under USSG § 3A1.4 that would substantially increase the final

calculation. *See* Addendum to PSR, Government Objection 1. However, after

further consideration, the government has elected to forego that argument and

withdraw its objection. The United States has no remaining objections to the PSR

and agrees with the probation officer's calculation of Alameti's guideline sentence.

     b. <u>Objection by the Defense</u>

     The defendant notified the Probation Officer that he objected to the 12-point

enhancement under § 2J1.2(b)(1)(C) as assessed at PSR ¶ 48. *See* Addendum to

PSR, Defense Objection 1. The objection should be overruled because the plain

language of the enhancement applies to both counts of conviction.

     USSG § 2J1.2(b)(1)(C) provides:

> If the (i) defendant was convicted under 18 U.S.C. § 1001 or § 1505;
> and (ii) statutory maximum term of eight years' imprisonment
> applies because the matter relates to international or domestic
> terrorism, increase by 12 levels.

Alameti pleaded guilty to Counts I and III of the indictment, each of which charges

a separate crime of making a false statement to a federal officer in a matter

involving terrorism. (*See* Doc. 10). The plea agreement (doc. 31 at 4) and offer of

proof (doc. 34 at 3) specifically note that an element of each offense is that

Alameti's false statement was made in relation to a matter involving international

or domestic terrorism. Alameti pleaded guilty to that element of each offense.

Following the change of plea hearing, Judge DeSoto issued Findings and Recommendations, finding that Alameti's plea of guilty was "knowing and voluntary and supported by an independent basis in fact sufficient to prove the essential elements of the offense charged," and that "all the statements in the plea agreement are true." (Doc. 38 at 2).   There were no objections to the Findings and Recommendations.  This Court adopted Judge DeSoto's Findings and Recommendations in an order dated September 16, 2019.  (Doc. 39).  Thus, by his guilty plea, Alameti stands convicted under 18 U.S.C. § 1001 and the statutory maximum term of eight years' imprisonment applies because offenses relate to international or domestic terrorism.  The plain language of § 2J1.2(b)(1)(C) applies to enhance Alameti's sentence, and it is properly applied in the PSR.

### III.   Alameti's Guideline Sentence Calculation

The PSR properly calculates Alameti's guideline sentence.  The base offense level for making a false statement when the statutory maximum is eight years' imprisonment, is 14.  PSR ¶ 47; USSG § 2J1.2(a).  As discussed above, the base offense level increases 12 points because the matter relates to international or domestic terrorism, bringing the adjusted offense level to 26.  PSR ¶¶ 48-51; USSG § 2J(b)(1)(c).  The adjusted offense level is reduced by three levels to reflect Alameti's acceptance of responsibility and timely notification of plea.  PSR ¶¶ 54-55; para USSG §§ 3E1.1(a)-(b).  Thus, the total offense level is 23.  PSR ¶ 56.

6

Alameti has one criminal history point, placing him in Criminal History Category I.  PSR ¶¶ 59-61.  With a total offense level of 23 and a Criminal History Category of I, the defendant's guideline imprisonment range is 46-57 months.  PSR ¶ 96; USSG § 5A.

## IV.    Sentencing Analysis

Section 3553(a) of Title 18 of the United States Code contains prefatory language — "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  Those purposes include the need for the sentence to:

- reflect the seriousness of the offense;

- promote respect for the law;

- provide just punishment for the offense;

- afford adequate deterrence to criminal conduct;

- protect the public from further crimes of the defendant; and,

- provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) sets forward additional considerations for the Court when imposing an appropriate sentence, including the nature and circumstances of the offense, the history and characteristics of the defendant, and the kinds of sentences available.  18 U.S.C. § 3553(a)(1), (3).  The Court should similarly consider the

7

sentencing guidelines and policy statements, as well as the need to avoid unwarranted sentencing disparities.  18 U.S.C. §3553(a)(4), (5), (6).  Finally, the Court should consider the need to provide restitution to any victims of the offense. 18 U.S.C. §3553(a)(7).

Beyond statutory guidance, the Court must consider the sentencing guidelines promulgated by the Sentencing Commission.  Calculating an accurate sentencing guideline range is the appropriate start for the Court.  *Rita v. United States*, 551 U.S. 338, 347-348 (2007).  Calculating and referencing to the sentencing guidelines allows defendants to start out with equal treatment and possible consequences, instead of being subjected to "the luck of the draw."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Moreover, the Court cannot, without explanation, ignore a sentencing factor or "shrug off" the Sentencing Commission's statements of policy.  *United States v. Bragg*, 582 F.3d 965, 970 (9th Cir. 2009).   If a district court contemplates a non-guidelines sentence, it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.  *Gall*, 552 U.S. at 50.

**V.     Sentencing Recommendation**

With the above sentencing factors in mind, and for the reasons set-forth below, the United States recommends a sentence at the top-end of guideline range, that being 57 months' imprisonment followed by three years of supervised release.

1.    <u>The Offense Conduct</u>[2]

Sometime prior to May 2018, Alameti became known to the FBI as a person of interest and someone who viewed and/or posted ISIS-related content on various internet and social media sites.  In May 2018, the FBI visited Alameti at his home in the Bronx, NY, and interviewed him.  At the time, Alameti denied that he was a member of ISIS, he denied support for ISIS, he admitted that he was a frequent marijuana user, and claimed that he only viewed ISIS content when he got high.

Following the FBI's visit, in January 2019, Alameti unwittingly encountered the FBI CHS on a pro-ISIS Facebook page where Alameti was posting pro-ISIS comments.  The CHS engaged Alameti and lead him to believe that he was an ISIS supporter who lived in the Middle East.  After the initial encounter, Alameti and the CHS began to regularly exchange text messages with each other via an encrypted messaging application.

Over the next eight weeks or so, Alameti and the source frequently communicated with one another.  During these conversations, Alameti told the CHS, on more than one occasion, that he was planning to travel to Syria to fight with ISIS.  Alameti also stated that he had been considering conducting an attack in the United States.  Some of his statements to the CHS included the following:

---

[2] The facts in this section are taken from PSR ¶¶ 10-41, the affidavit in support of criminal complaint (doc. 1a) and the United States' Offer of Proof (doc. 34).

- On February 11, 2019, Alameti sent a message to the CHS stating, "I wanna go kill some fags."  When the CHS replied that they needed three months to plan, Alameti replied, "We need arms ammo and explosives," "And also the uhaul," and "Gasoline mixed in with explosives will make a good blast also it will burn longer;"

- On February 22, 2019, Alameti shared a screenshot with the CHS of a chart showing blast radius by vehicle type and stated "Small boxer van is uhaul.  That a [sic] blast up to 2750 feet;"

- Between February 27, 2019 and February 28, 2019, Alameti sent the CHS a series of messages, including:

  o "When will the time come for us to hunt them down.  I will stand over them while I pierce their bodies with hollow tips.  Inshallah we take as many kuffars[3] with us.  For the brothers who died and the kids and women."

  o "We need extensive research on our ideal target." When the CHS asked what targets, Alameti replied, "Like I said any military facilities or simply a recruiting center.  But there is options for choices."

  o The CHS asked if Alameti thought bombs were a must, and Alameti replied, "When looking for explosives we are subject to inspection. We must make it our self," and "But if we can't try then the guns are the ideal weapons."

  o Alameti also stated "I am doing it for the Hadith[4] of eye for eye and blood for blood since America has killed our Muslim civilians."

In March 2019, the FBI executed a search warrant on Alameti's Facebook account.  A review of the account revealed a series of communications between

---

[3] "Kuffar" is a term meaning non-believer.
[4] A Hadith is a collection of traditions containing sayings of the prophet Muhammad which, constitute a major source of guidance for Muslims.

Alameti another individual in the Albanian language.  An FBI linguist translated a series of messages between Alameti and the other individual between January 26 and February 27, 2019, wherein Alameti told the other individual that he intended to travel to Iraq and fight, and that he was in contact with a person who would facilitate his travel.  The individual who Alameti believed would facilitate his travel was, in fact, the FBI CHS described above.

On March 13, Alameti sent a message to the CHS stating that he purchased a bust ticket to travel from New York to Bozeman, Montana.  The next day, he sent a message to the CHS sating that he was on a bus to Montana, that he had a job interview, and "I wish I would have fought with u there. I wanted to be marterd [sic] with you."

On March 15, 2019, while en route to Montana, Alameti became aware of an assault on a mosque in Christchurch, New Zealand, where a gunman killed dozens of Muslim worshipers.  The gunman livestreamed the assault on several social media platforms.  During a series of conversations with the CHS, Alameti asked the CHS to send him the link to the livestream.  The CHS responded to the request by stating:  "Akhi[5] the video is heart wrenching walla u don't even wanna see it." Alameti replied, "I have to akhi", "I [sic] will fuel me," and, "To plot please send it akhi." The CHS messaged, "Fuel you for what akhi are sure you wanna act like the

---

[5] "Akhi" is an Arabic term meaning "my brother."

kuffar and attack a church or something?"  In response, Alameti stated "No not a church," and "But I will attack random people to avenge the blood."  The CHS messaged, "But akhi are you sure its [sic] halal[6] to shoot random people and act like the kuffar did to us."  Alameti responded, "Of course akhi," "We must ave he [sic] the death and even a single drop of blood should be avenged akhi," "Muslim blood is precious," and "I'm gonna buy a gun in Montana."

Following this conversation, at a layover in Billings, Alameti went to a Walmart and purchased a pellet pistol that was designed to look like a snub nose .357 revolver.

Alameti arrived in Bozeman on March 17, 2019.  He rented a room at a local hotel and spent several days hanging around Bozeman.  Alameti was observed going to a sporting goods store, looking at machetes, knives, camping gear, and inquiring about firearms.  Surveillance also observed him purchase a .177 caliber air rifle.  By March 20, 2019, he was evicted from his hotel room when it was discovered that he was smoking marijuana inside.  The FBI later searched the room and found the air rifle that Alameti left behind.

On the evening of March 20, Alameti checked into a hostel.  Five days later, he was transported from the hostel to a hospital where he was treated for acute alcohol intoxication.  The hostel manager secured Alameti's belongings and found

---

[6] "Halal" is an Arabic term meaning "permissible".

what was then believed to be a handgun, but was later determined to be the pellet pistol.  The manager contacted the Bozeman Police Department, who came and collected Alameti's belongings.

Upon release from the hospital, Alameti walked to the police station and agreed to speak with a police detective and an FBI Special Agent.  During the interview, the Special Agent advised Alameti several times that it was unlawful to provide false information during the course of the interview.  Undeterred, Alameti denied that he had ever talked about traveling overseas to fight for ISIS, he asserted that he never said that he wanted to hurt any Americans or anyone in the military, and claimed that he had no desire to hurt anyone with guns.

Alameti consented to a search of his cellular phone.  A review of the phone showed internet searches in January and February 2019 for the phrases:  "liveleak stabbed to death," "muslims kill liveleak," "us soldiers and pkk killed," "isis sinai wiki," "what countries can I visit with Albanian passport," "nyc to Albania to Jordon [sic]," "islamic state," and "isis attacks liveleak," "federal buildings in nyc," "tactical knives for sale," "taxi driver gets stabbed liveleak," "taxi driver gets shot liveleak," "police ambushed liveleak," "isis live map," "Holland tunnel," "car bomb," and "isis jihadology."

Over the course of the next week, Alameti began to express an interest in visiting a gun range in Bozeman.  On April 3, 2019, his interest ripened and he

attempted to rent a Springfield .308 Winchester caliber semi-automatic rifle at the range.  After he took possession of the unloaded weapon, the FBI arrested him.

Alameti ultimately admitted in a *Mirandized* interview with the FBI, he had, in fact, previously told others, including the CHS, that he planned to travel overseas and fight for ISIS because he wanted to die a martyr's death.  He admitted that he had previously discussed a plan to fly from New York to Albania to meet a contact, and from there, they would travel to Syria via Jordan.  Alameti said that, once he was in Syria, he planned to go to a training camp where he could learn how to use weapons and make explosives.  He admitted to researching airplane tickets but stated he did not have enough money to buy them.

Alameti also admitted to exchanging messages with the CHS.  He admitted to discussing the commission of an attack in the United States and he identified potential targets as gay night clubs, a federal building, and an Army recruiting center.  He admitted to talking with the CHS about explosives and admitted sending the CHS an Internet link to access a file discussing how to make explosives.  Additionally, Alameti admitted to making various statements to the CHS, including that he wanted to "shoot people or something," "I will attack random people to avenge the blood," and, "I'm going to Montana and gonna [sic] buy a gun since all they need is a background check and ID."  Finally, Alameti disclosed that, since his conversation with the FBI on March 25th, he had continued

14

to watch ISIS videos, including earlier that day.  Alameti was charged by

complaint (*see* doc. 1a) and has remained in federal custody since that time.

2.    Post Arrest Conduct[7]

Alameti has served the majority of his custody so far at the Crossroads

Correctional Center in Shelby, Montana.  Another inmate has alleged that in

October 2019, Alameti approached him and inquired if the inmate could get

Alameti access to guns and/or explosives.

Additionally, on November 22, 2019, personnel at the correctional center

conducted a facility-wide shakedown of the inmate housing units, which included

Alameti's cell.  A book was located inside Alameti's cell titled, "The World of the

Jinn and Devils:  In the Light of the Qur'an and Sunnah."  Inside there were several

pages of hand-written notes in English, Arabic and Albanian, which appear to be in

Alameti's hand-writing.  Some of the phrases in English include the words "Death

to Americ[sic]," "Death to Isreal[sic]," "ISIS will remain weather[sic] the filthy

disbelievers fight it or not," and "May the Islamic State of Iraq and Syria live on."

Included in the hand-written notes not written in English are the names:

"Abu Bakr al Baghdadi," "Abu Mohamed al Adnani," "Abu Musab Az Zarqawi,"

"Anwar Al Waliki," and "Abu Hudaifah."  Abu Bakr al Bahdadi was the leader of

---

[7] The facts in this section are derived from reports of investigation supplied by the Crossroads
Correctional Facility and the FBI.  The discovery supporting these facts has been provided to the
defense.

the Islamic State until he was killed by U.S. military forces in October 2019, al-Adnani was a spokesman and a senior leader for the Islamic State until he was killed in 2016, Zarqawi was the leader of al-Qaeda in Iraq until he was killed in 2006, and al-Awlaki was an imam who espoused anti-U.S. rhetoric and was killed in a drone strike in 2011.  The FBI is in the process of having the remaining portions of the hand-written text translated.

Correctional officers also observed writing on Alameti's cell wall.  Some of the writing was in English and included the phrases, "Fuck USA,"  "Fuck the f3ds [sic]," and "Much love Abu-Bakr Al-Bagdadi (May the peace and blessings of Allah be upon Him)."  Alameti had also drawn a picture of the ISIS flag on the cell wall with a blue pen.

Also during the sweep, officers found a book in Alameti's cell that had a razor blade tucked between the pages.

3.     The Seriousness of the Offense

Alameti's conduct is unquestionably serious and warrants a guideline term of imprisonment.  Since declaring its caliphate in June 2014, ISIS has conducted or inspired more than 140 terrorist attacks in 29 countries other than Iraq and Syria.[8] It is well documented that this organization encourages the use of indiscriminate

---

[8] Tim Lister, Ray Sanchez, Mark Bixler, Sean O'Key, Michael Hogenmiller, and Mohammed Tawfeeq, CNN, *ISIS goes global:  143 attacks in 29 countries have killed 2,043*, https://www.cnn.com/2015/12/17/world/mapping-isis-attacks-around-the-world/index.html (February 12, 2018).

violence to advance its ideology and encourages its supports to commit attacks by any means, including by suicide bomb.  Alameti understood the nature of that ideology, agreed with those tactics, and overtly discussed joining their cause.

When confronted by law enforcement in May 2018, he lied about the nature of his interest in ISIS and his interest in conducting an ISIS-inspired attack in the United States.  When confronted in March 2019, he again lied about his stated desires to travel overseas and be martyred fighting for ISIS, or to conduct an attack in the United States.  He only divulged the truth when he was directly confronted with evidence of his prior statements.  Clearly his conduct is severe and warrants a guideline term of imprisonment.

  4. <u>The Need for Deterrence</u>

More importantly, a prison term at the upper end of the guideline range – 57 months – is necessary to deter Alameti's continued deportment.  When the FBI came to Alameti's Bronx apartment in 2018 and notified him that they were concerned about his internet activity, he was not deterred from seeking out ISIS propaganda or other ISIS supporters.  To the contrary, he persisted, made contact with the CHS, and discussed various plans for committing an attack.

When he was confronted by the FBI in Bozeman on March 25, 2019, Alameti was again undeterred from seeking out ISIS propaganda, or from finding a way to get a gun.  In fact, he told the FBI on April 3, 2019, that he looked at ISIS

propaganda videos after he met with them the previous week and even watched ISIS videos online before going to the shooting range.

Moreover, being arrested, indicted, pleading guilty to lying in a terrorism investigation, and being held in a federal prison pending sentencing, has not deterred Alameti from his underlying support for ISIS.  He asked another inmate about getting guns and explosives, and continues to write messages of support of ISIS and its now deceased leaders.  Just weeks before his sentencing date, he was found having drawn an ISIS flag on his cell wall and proclaiming that ISIS will continue to endure despite the organization's defeat on the battlefield.

To the average contrite citizen, being contacted multiple times by the FBI to discuss suspected affiliation with or support for a terrorist organization would be enough to cause one to take pause, and perhaps change his activities.  And, when that proves insufficient, being prosecuted by the United States government for those activities would expected to reinforce message.  But Alameti continues unabated, apparently unwillingly or unable to recognize the sinister implications of his activities.  Clearly, a lengthy term of imprisonment, followed by three years of supervised release, is sufficient and necessary to send an even stronger message that Alameti, to this point, refuses to heed.

     5.   <u>The Need to Protect the Public</u>

Finally, a term of 57 months is needed to guard against the more unsavory

possibility that Alameti's discussions with the CHS, and others he met online, were not just idle chatter.  It may be tempting for the Court to look at Alameti as he tries to describe himself, a misguided youth who was angry with his parents and needs help with a marijuana problem.  *See* PSR ¶ 44.  While some portion of that self-profile *may* be true, it is *certain* that Alameti spent significant time discussing, plotting, and planning various ways he could either get to Syria so he could join ISIS, fight on the battlefield, and be martyred in that organizations service, or in the alternative, to commit an indiscriminate act of violence against American citizens in the United States by utilizing guns, explosives, both, or methods he has not yet divulged.  The only way to fully guarantee that Alameti cannot make good on his discussions with the CHS, or any other plans he harbors, and to protect the public from a sinister outcome he seems so fascinated with, is to take him at his word and impose a sentence at the top-end of the guideline range.

## VI.   Conclusion

Based on the foregoing, the United States respectfully recommends that he Court impose a sentence consisting of 57 months of imprisonment, three years of supervised release, and a $200 special assessment.  Such a sentence is sufficient, but not greater than necessary, to punish the offender, to address the nature and seriousness of his conduct, to send a needed message of deterrence, and to protect the public.

RESPECTFULLY SUBMITTED this 4th day of December 2019.

KURT G. ALME
United States Attorney

/s/ Jeffrey K. Starnes
JEFFREY K. STARNES
Assistant U.S. Attorney
Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule, this certifies that the body of the attached response

contains 4,601 words, excluding the caption and certificate of compliance.

KURT G. ALME
United States Attorney

/s/ Jeffrey K. Starnes
JEFFREY K. STARNES
Assistant U.S. Attorney
Attorney for Plaintiff