Colin M. Stephens
SMITH & STEPHENS, P.C.
315 W. Pine
Missoula, MT 59802
Phone: (406) 721-0300
colin@smithstephens.com

    Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-vs-<br><br>FABJAN ALAMETI,<br><br>Defendant. | Cause No. CR 19-13<br><br><br>DEFENDANT'S SENTENCING MEMORANDUM |
|---|---|

## INTRODUCTION

At the age of 21, Fabjan Alameti (Fabjan) appears before this Court for sentencing on two Class D federal felony convictions. Although this Memorandum will continue to highlight the stark contract between Fabjan's offenses of conviction and his First Amendment rights, Fabjan withdraws his objection to the 12 point

-1-

offense level increase under U.S.S.G. § 2J1.2(b)(1)(C).  As this was Fabjan's only objection to the advisory guideline range as calculated in the final presentence report (PSR), Fabjan agrees the guideline range set forth in the final PSR is correct.

As set forth in the PSR, Fabjan's total adjusted offense level is 23.  He has one criminal history point and is therefore a Criminal History Category I.  Consequently, Fabjan faces an advisory guideline range of 46-57 months.  By statute, Fabjan faces a maximum sentence of imprisonment of 8 years on each count of conviction; these sentences can run either concurrently[1] or consecutively for a total theoretical statutory maximum of 16 years.

By statue, Fabjan faces a possible fine of $250,000 on each count.  Under the guidelines, the fine range for each count of conviction is from $20,000 to $200,000.  (PSR ¶ 106).  He is also required to pay a $100 special assessment on each count.  That assessment is payable immediately.

---

[1] 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively.")

As to probation, the statutes allow the Court to impose a term of probation of not less than one nor more than five years on each count. Probation is not available under the guidelines. (PSR ¶ 103).

Under both the statues and the guidelines, the maximum term of supervised release is 3 years.

Absent a mandatory minimum sentence, the driving force behind all sentencing arguments in this matter are the numerous factors set forth in 18 U.S.C. § 3553(a) and the need for the Court to impose a sentence that is "sufficient but not greater than necessary."

In light of those factors and the facts in this unique case, Fabjan appears before the Court for sentencing on December 13, 2019 and requests this Court impose two sentences of 24 months, concurrent to each other. Fabjan requests this Court follow that sentence with two concurrent 3-year terms of supervised release. Finally, Fabjan asks the Court to affirm that he lacks both the ability to pay a fine (PSR ¶ 94) and the costs of prosecution (PSR ¶ 107).

ARGUMENT

I. Nature and Circumstances of the Offense

Lying to the FBI, or any investigative agency for that matter, is a serious offense. The need for, and emphasis on, truth is more relevant and necessary than ever in light of recent discussions that we are (d)evolving into a "post-truth" Orwellian society. Regardless of one's feelings on any particular topic or anti-authoritarian bent, the simple fact is that there is a significant public interest in the criminalization of lying to government agencies.

When confronted by FBI agents and asked if he had ever talked about traveling overseas to fight for ISIS, Fabjan said he had not. He had talked about it. That was a lie. When asked by agents if he ever expressed that he wanted to hurt Americans or anyone in the military, Fabjan said he had not. He had. That, too, was a lie. These are the two lies to which Fabjan has plead guilty and for which he is to be sentenced. They are serious crimes.

What mitigates the severity of the offenses, is the circumstances under which they arose. The paradox of this case is that if Fabjan had

told the agents the truth, he would likely not be appearing before the Court for felony sentencing. However reprehensible Fabjan's thoughts or comments might appear to either the agents or anyone else, they are subject to the protection of the First Amendment of the United States Constitution.

Fabjan has expressed his remorse to this Court for the crimes of conviction. He will do so, again, during his sentencing. The Government's sentencing memorandum points to certain expressions Fabjan has made since writing his letter of acceptance of responsibility to the Court, i.e., the writings on the wall and in a book found in his cell in Shelby. While these writings may appear to fly in the face of Fabjan's acceptance of responsibility, they actually don't. In his letter to this Court, Fabjan told the Court that "[s]ometimes I find letting go of personal desires very difficult maybe it's a lack of self control. . . ." (PSR ¶ 44). Again, Fabjan is 21 years old and, again, while phrases like "Death to Americ [sic]" and "Death to Isreal [sic]" are not to be found in the lyrics of a Toby Keith song, they are just as protected by the First Amendment as the lyrics.

Regarding the nature and circumstances of the offense, this Court is in the unenviable position of having to separate the kernels of the actual offense from the chaff of the protected speech. In order to arrive at a sentence that is sufficient but not greater than necessary, Fabjan urges this Court not to impose a sentence on what he said to arouse FBI suspicion, but what he did when confronted by the FBI. Those actions, i.e., the lies, are offenses of conviction. By contrast, Fabjan's exercise of a fundamental constitutional liberty should form no basis for the sentence beyond the 12-point offense level sanction that has been applied under U.S.S.G. § 2J1.2(b)(1)(C).

## II. History and Characteristics of the Defendant

When he committed these offenses, Fabjan was an adrift, substance using kid who found self-worth and comradery in an on-line universe. For all of its treasures the internet is, at worst, a giant pit of garbage. At best, it is an unregulated marketplace of ideas where the unweary and adrift can easily be targeted and led astray. No longer do the Holden Caulfields of the world have to engage in Odyssean quests through New York to get good advice about the world and their place in

it from their former English teacher. These days, the Holden Caulfields of the world, and there are and always have been many, can seek easy answers on the internet. However, those answers lack the depth, profundity, and maturity of that given to the original Holden.

> Among other things, you'll find that you're not the first person who was ever confused and frightened and even sickened by human behavior. You're by no means alone on that score, you'll be excited and stimulated to know. Many, many men have been just as troubled morally and spiritually as you are right now. Happily, some of them kept records of their troubles. You'll learn from them – if you want to. Just as somebody, if you have something to offer, someone will learn something from you. It's a beautiful reciprocal arrangement. And it isn't education. It's history. It's poetry.

J.D. Salinger, Catcher in the Rye, pgs 296-297, Little, Brown and Company, ebook edition 2019.

For the majority of his life, Fabjan has struggled with his identity and searched for a culture he never fully knew but wanted to understand. Fabjan was born in Albania which, according to the Pew Research Center, has a Muslim population of 79.9%.[2] Although his family moved to the Bronx, New York when he was only one, his family

---

[2] https://www.pewforum.org/chart/interactive-data-table-world-muslim-population-by-country/

returned to Albania to visit family every summer. (PSR ¶ 65). Like millions of other immigrants before them, Fabjan's family moved into a section of the Bronx that was populated with other immigrants like themselves. Fabjan's family, however, was not overly religious. As Fabjan struggled through is teenage years and early 20s, he turned to a triumvirate of drugs, the internet, and religion.

In Graham v. Florida, 560 U.S. 48, 68 (2010), the Supreme Court continued its recognition that "because juveniles have lessened culpability they are less deserving of the most severe punishments." The United States Sentencing Commission has also cited numerous neurological research studies that show brain development is not fully realized in most people until they turn 25 years old, meaning the brain of a defendant who commits a crime at the age of 21 or 22 is almost as undeveloped as a 16 or 17-year-old juvenile. United States Sentencing Commission Report, "Youthful Offenders in the Federal System," at pgs 6-7.[3] Among other things, this relative immaturity in higher order

---

[3]Available at:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf

brain functioning can contribute to "poor impulse control, diminished risk avoidance and underdeveloped moral reasoning." Id. (citations omitted). Nowhere is the evidence of this cognitive science more evident than with Fabjan. To his credit, Fabjan recognizes that he struggles with impulse control. That recognition is expressed to this Court in his acceptance letter.

Fabjan does not deny all of the things attributed to him by the Government. However, those statements only represent a portion of what he has said. On countless other occasions, Fabjan has made statements that are contrary to those cited by the Government. In total, they paint a picture of the conflict and turmoil that exists not only in Fabjan but in every other adolescent and youthful individuals who struggle to find their place in the world.

Another aspect of Fabjan's characteristics is the need to conform and accommodate. Throughout his time in Bozeman, Fabjan was often accompanied by a Confidential Human Source (CHS) who was reporting back to the FBI. For example, on March 27, 2019, Fabjan and CHS were discussing Islam. The Government's discovery

demonstrates how the CHS helped pour gas on the fire of Fabjan's more inflammatory statements. On one page of the discovery, there is an email. The entire email is redacted except for the date (March 15, 2019), the subject line, and the following sentence, "This is now an issue whereby the CHS cannot be relied upon and is caused [sic] more harm than good." Govt. Bate # 4918. Despite this conclusion, the Government continued to use the CHS to monitor Fabjan.

The discovery summarizes some conversations between Fabjan and the CHS. This exchange occurred on March 27, 2019, twelve days after the email that the CHS had done more harm than good.

> CHS and [Fabjan] discuss Islam. [Fabjan] says most [unintelligible] don't want violence and are about peace. CHS says those people are "pussies" until someone walks into a Masjid and slaughters their women and children. CHS and [Fabjan] walk and talk about religion and [Fabjan] says some say they should be brothers with their Jewish friends and treat them well. CHS disagrees and says the Iman in [REDACTED by undersigned] gave him up, that the Iman was talking bad about CHS. CHS says he is defending the honor of Islam.

Govt. Bate # 4353.

In the CHS, Fabjan found a confidant with whom he could discuss religious topics and ponder the nature of their shared religion. For

example, on March 27, 2019, Fabjan asks the CHS about the murder of the famed journalist, Jamal Khashoggi. Fabjan tells the CHS that he saw a video of the Kashoggi getting killed and asks the CHS "if it was Muslim way to chop him up, instead of shooting him." Govt. Bate # 4359. Fabjan also asks the CHS if it is a "major sin to smoke weed, wondering if God would be angry about it." Id.

The two discussed Fabjan's plans, both past and present. Fabjan told the CHS that he had wanted to go join ISIS but did not have the money and was too young. Fabjan then told the CHS "that Mohammed had told him [Fabjan] that he has missed his chance and there's no getting in any more." Govt. Bate # 4354. Fabjan later says his does not know why he came to Bozeman but thinks it was a good move. When asked where he sees himself in 10 years, Fabjan responded, "probably just working, if he is not dead or anything. [Fabjan] says he wants to get a good place and maybe start a family." Then, Fabjan and the CHS talked about "chilling in the car" and "about shoes." Govt. Bate # 4360.

Other statements found in the Government's discovery are:

"CHS and [Fabjan] discuss Islam being a religion of peace and [Fabjan] says peace is for 'us.'" . . . . . . . . . . Govt. Bate # 4355

-11-

> "CHS says they are not the people to go into a church and kill people. [Fabjan] says he cannot do something like that . . .  Id.
>
> "CHS asks [Fabjan] if he thinks he will stay in Montana and [Fabjan] says hopefully he will. [Fabjan] says he does not want to go back to New York and he did nothing there by stay home. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Govt. Bate # 4370
>
> "CHS and [Fabjan] discuss Assad and how he wants power. CHS says this country [America] is only interested in countries with oil.  CHS asks [Fabjan] why 'they' are in Afghanistan and [Fabjan] says it is rich with money resources.  CHS says they keep saying it was because of 9/11. [Fabjan] and CHS discuss oil in Saudi Arabia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Govt. Bate # 4359.

Earlier, between January 9 and January 16, 2019, Fabjan had conversations with a CHS.[4]  Fabjan tells the CHS that he is lost and in need of advice.  Govt. Bate # 118.  Fabjan tells the CHS that he was initially thinking about carrying out an attack on U.S. government buildings, gay clubs, Jewish Temples or U.S. Army Recruiting Centers. "However, after doing his own research and talking with other 'Muslim brothers,' [Fabjan] determined that such an attack in the U.S. would be haram [i.e., sinful or forbidden]. [Fabjan] explained that people in the U.S. gave him a visa, allowed him to be in their country and gave him

---

[4]Counsel is unclear if this is the same CHS that Fabjan spent time with in Bozeman.

citizenship. He can't 'backstab' them by conducting an attack in the U.S. After reaching this conclusion, [Fabjan] said he was off that plan and had a new plan to travel." Govt. Bate # 116. Shortly after that, Fabjan moved to Bozeman.

Viewed in isolation, Fabjan's thoughts and statements about hurting Americans, soldiers, gays, and Jews paint only a the Mr. Hyde version of Fabjan. The discovery paints an equally clear picture of that there is a Dr. Henry Jekyll that exists within Fabjan, a kid who recognizes that backstabbing the country that took he and his family in, would be a sin under the tenets of Islam. The personal history and characteristics of the person who twice lied to the FBI are those of a scared, alienated, confused, and conflicted young man. They are not the characteristics of a devoted zealot bent on violence and intimidation. In over-vilifying Fabjan, the Government risks minimizing the risks posed by the true threats to America, both foreign and domestic.

### III. Respect for the Law and Just Punishment

A sentence of 24 months will promote respect for the law and will

be a just punishment. By the time he is sentenced, Fabjan will have already served 8 months and 10 days. An additional 16 months will serve as a just punishment for the offenses of conviction. It will also promote respect for the law.

The Government points to Fabjan's post-plea activities while in prison, e.g., apparent continued devotion to ISIS and disrespect for America and the "feds." While Fabjan continues to assert his First Amendment right to political and religious speech, he does not deny that these expressions could be viewed to reflect a continued disrespect for the institution of the law. They are not. They are expressions of frustration at his current situation and exemplify the cognitive science regarding brain development referenced above.

Since his arrest, Fabjan has largely been held in solitary confinement in the Crossroads facility for his own safety. Anecdotally, the undersigned spoke to a former client who personally witnessed Fabjan get physically assaulted while in Shelby. That individual thought the assault was funny and laughed while recounting the tale.

Under the stress of solitary confinement and living in a confined

space – where the majority of individuals lack Voltaire's ability to disapprove of what is said but faith in the right to say it – Fabjan's continued acting out and anti-authoritarian expressions are understandable. While it may concern the Court, an additional 16-month sentence will serve as just punishment and promote respect for the law. This sentence will serve to teach Fabjan that there is a critical legal difference between being free to think and speak your beliefs versus lying to federal agents about what you have said and thought. Understanding the difference will help him realize that there is a balance between retaining individual beliefs and crossing over into criminal activity. Perhaps more than anything else, Fabjan requires education on the law to help promote respect for it.

## IV. Other Factors

A sentence of 24 months is sufficient deterrence for the offenses of conviction. 24 months of incarceration is sufficiently punitive to teach Fabjan the lesson that lying to the FBI is serious and illegal. During the additional months in prison, it is his hope to further his education, including religious education. Fabjan still seeks answers to the

questions that he posed to the CHS and with which he still struggles. In addition to deterrence, these additional months will fulfill the § 3553(a) factor that the Court impose a sentence in consideration with the need to provide Fabjan educational training.

While education will aid deterrence, it will also protect the public from future crimes. Supervised release will further protect the public from future crimes because Fabjan will be under the watchful eye of the United State Probation Office. Also, no doubt, watching Fabjan closely will be any number of other government organizations. Fabjan has been classified as having an ISIS affiliation by the staff at Crossroads Correctional Facility. The FBI will likely continue either active or passive monitoring of Fabjan and his electronic correspondence. Additionally, Fabjan's ability to travel has been greatly restricted by inclusion on the "do not fly" list. It is also likely that the recent tragic events in London will highlight either the reality or myth that individuals with suspected terrorist ties must be constantly suspected and supervised.

It is likely that Fabjan's life will have changed irreparably and he

-16-

faces heightened scrutiny of every action and utterance for the remainder of his days.  That, alone, is a significant deterrent.  It is a significant punishment as well.

## CONCLUSION

This case will likely be especially difficult for the Court in calculating a sentence that is sufficient but not greater than necessary.  Fabjan recognizes that he is requesting a downward variance from the advisory guideline range.  Under the totality of the circumstances of this case, however, such a variance is reasonable.  As it stands, the advisory guideline range is increased by 12 points beyond the base offense level.[5]  Fabjan does not disagree with the application of the enhancement and recognizes that it is appropriate under the law and language of the guidelines.  However, the facts that give rise to that permissible enhancement also spread into speech and though that are among the most sacrosanct in American law, religion and politics.  These factors warrant a downward variance under § 3553(a) despite the fact that they also serve for an upward increase under the guidelines.

---

[5] Were it not for this enhancement, Fabjan would be facing an advisory guideline range of 4-10 months.

-17-

24 months is a sufficient but not greater than necessary sentence for Fabjan. This custodial sentence, coupled with restrictive supervised release, will satisfy all of the § 3553(a) factors in light of the circumstances of this case and the offenses of conviction.

Respectfully submitted this 6th day of December 2019.

/s/ Colin M. Stephens  
Colin M. Stephens  
SMITH & STEPHENS, P.C.  
Attorney for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to LR, I hereby certify that this Sentencing Memorandum contains 3,353 words, excluding the caption and required certificates.

Dated this 6th day of December, 2019.

                                              /s/ Colin M. Stephens
                                              Colin M. Stephens
                                              SMITH & STEPHENS, P.C.
                                              Attorney for Defendant

## CERTIFICATE OF SERVICE

I, Colin M. Stephens, do hereby certify that I delivered a true and correct copy of this Defendant's Sentencing Memorandum to the following individuals via the means indicated below.

Jeffrey K. Starnes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CM/ECF
Assistant United States Attorney

Dated this 6th day of December, 2019.

/s/ Colin M. Stephens<br>
Colin M. Stephens<br>
SMITH & STEPHENS, P.C.<br>
Attorney for Defendant